UNITED STATES, Appellee,

v.

Pedro J. RIVERA, Specialist Four, U.S. Army, Appellant.

Dkt. No. 37113/AR.
CM 437465/G.

U. S. Court of Military Appeals.

Nov. 24, 1980.

*Captain Courtney B. Wheeler* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Benjamin A. Sims, Major Carlos A. Vallecillo, Captain William J. Carter* (on brief), for appellant.

Captain Robert D. Higgenbotham (argued)· *Colonel Thomas H. Davis, Colonel R. R. Boller, Captain Douglas P. Franklin, Captain Rolland S. Roup* (on brief); *Colonel Thomas H. Davis, Major Ted B. Borek, Major David McNeill, Jr., Captain Harry J. Gruchala, Captain Rolland S. Roup, Captain John T. Meixell,* for appellee.

## Opinion of the Court

EVERETT, Chief Judge.

The appellant was tried by general court–martial in Wurzburg and Schweinfurt, Federal Republic of Germany. Contrary to his pleas, he was found guilty of one specification alleging possession of heroin, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934, and he was sentenced to a bad–conduct discharge, confinement at hard labor for 2 months, and reduction to the lowest enlisted grade. The convening authority approved the sentence, and, in due course, the United States Army Court of Military Review affirmed in an unpublished opinion.

■ In this Court, appellant renews (7 M.J. 64) a claim he made for the first time in the Court of Military Review that the trial judge erred when, over defense objection, he admitted evidence of the heroin possessed by him, seized pursuant to a search authorized by a commander who was not neutral and detached.[1] We agree, and conclude that setting aside the conviction and dismissing the charge is required.

I

The heroin was discovered in the appellant's possession pursuant to a search authorized and conducted by Captain John Moncure, the appellant's troop commander. About 1700 hours on April 13, 1978, Captain Moncure was called by his squadron commander, Lieutenant Colonel Conrad, and was asked to come to Conrad's office. Once there, Moncure was advised by Conrad that Lieutenant Colonel Eggleston, commander of a neighboring artillery battalion, had called him and had advised that what Eggleston had considered a very reliable source had informed him that Rivera would have heroin in his possession that night and would have it ready for resale the next morning. Eggleston had not revealed the informant's name to Conrad, nor any specifics about his reliability—only that Eggleston had "had good luck in the past with him." Colonel Conrad did not instruct Captain Moncure on whether or how to proceed. Rather, Conrad testified that his role was as an intermediary connecting Colonel Eggleston and Captain Moncure.

Moncure told his first sergeant that evening what he had learned from Conrad. The first thing the next morning, the first sergeant showed Moncure an entry in the Charge of Quarters (CQ) log indicating that a person named "Maldonado" from Eggleston's battalion had visited Rivera the last evening. At that point, Moncure thought that Maldonado might be the connection for Rivera's heroin. To further understand the situation, Moncure decided to visit Maldonado's battery commander. Moncure specifi-

---

1. At trial, the appellant through his trial defense counsel interposed a timely objection to the admission of this evidence on the basis that the authorizing official lacked the requisite probable cause, but at no time did he urge additionally that that official lacked the requisite neutrality to have made the probable cause determination. In the face of this omission, the Government urges that we find that the appellant waived his evidentiary objection on this particular theory and cannot take "advantage of a 'gap' in the record, for which he bears responsibility." *See* Mil.R.Evid. 103(a)(1). However, because the objection that defense counsel did make related to lack of probable cause, the circumstances leading to the com- mander's probable cause determination, as well as the conduct of the commander during the ensuing search, are fully reflected in the record and no "gap" in this connection exists. Thus, as the Supreme Court of the United States recently concluded in a similar instance, "the trial resulted in a record of amply sufficient detail and depth from which the determination may be made." *Rawlings v. Kentucky,* 448 U.S. 98, 107, 100 S.Ct. 2556, 2562, 65 L. Ed.2d 633 (1980), quoting *Brown v. Illinois,* 422 U.S. 590, 604, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416 (1975). *But see Rawlings v. Kentucky, supra,* 100 S.Ct. at 2566 (White, J., concurring in part).

cally testified that seeing the CQ log was "the stimulus for my continuing the investigation that early in the morning."

Having made his decision on how to proceed, Moncure called on Maldonado's battery commander sometime after the 0745 formation. He learned that Maldonado was a known drug abuser and that he had become an informant for Colonel Eggleston. Moreover, the commander advised Moncure that Maldonado was still believed to be using and selling drugs.

At the end of this meeting, Moncure returned to the barracks and called Colonel Conrad to relay what he had learned. Conrad told him to call the staff judge advocate's office to see "what else I had to find out before I could made a decision on him." Captain Rivers at the SJA's office advised Moncure to ask Colonel Eggleston two questions: First, what specifically was the reliability of the informant and, second, where did the informant get his information.

When Moncure called Colonel Eggleston, he learned for the first time that Maldonado was the source of Eggleston's information. Asking Eggleston the questions Captain Rivers had suggested that he ask and satisfying himself that he had probable cause to search, Moncure summoned Rivera from his work station "and proceeded to search his person and his living area." Accompanied by the troop executive officer, First Lieutenant Chamales [2]—whose purpose in going along with Moncure was, in Moncure's words at trial, "to help me search the area and Rivera"—Moncure went to Rivera's barracks room where he "began the search" at 0830 hours. When Chamales told Rivera to empty his pockets, the appellant threw a paper packet—ultimately proved to contain heroin—onto his bed. Captain Moncure picked the packet off the

bed and assumed custody of it and of all other evidence seized.[3] He subsequently turned all of the evidence over to a military policeman and an agent of the Army's Criminal Investigation Detachment (CID).

## II

In "summarily comment[ing]" on the same claim of Captain Moncure's lack of neutrality as now made before us, the Court of Military Review opined: "A commanding officer need not be a neutral and detached magistrate to authorize a search under present military law." When asked during the oral presentation of this case whether the Government was now relying in any part on this apparent basis for the disposition of the matter in the court, below, government counsel responded in the negative.

■ To whatever extent this single statement by the Court of Military Review reflects a conclusion that the authorizing official, whether the commander or someone else, need not be neutral and detached when making his probable cause determination, government counsel's refusal to advance this position was well founded. In *United States v. Staggs*, 23 U.S.C.M.A. 111, 48 C.M.R. 672 (1974), Chief Judge Duncan wrote for the Court:

> Whether an authorization to search is made by a commanding officer, or as in this case by his delegate, the act of authorizing a search on the basis of probable cause is a " 'judicial function.' " *United States v. Drew*, 15 U.S.C.M.A. 449, 454, 35 C.M.R. 421, 425 (1965). "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United*

2. At one point in the trial, Captain Moncure answered in the affirmative when asked whether "Lieutenant Chamales [was] *one of the two designated agents there to help you with the search*". (Emphasis added). However, the record does not reflect clearly the presence of a third member of the search party or, if present, his or her identity.

3. The other evidence seized included a small wooden box containing 5.52 grams of hashish and a smoking pipe in which marihuana residue was detected. The trial judge sustained a defense objection to admission of this evidence and findings of not guilty were entered to specifications alleging their possession.

*States*, 389 U.S. 347, 357, [88 S.Ct. 507, 19 L.Ed.2d 576] (1967) (footnotes omitted). One well–recognized exception to the requirement that a magistrate or judicial officer must authorize certain searches is found in the military practice permitting commanding officers or their delegates to authorize searches upon probable cause. Paragraph 152, MCM. Nevertheless, we have held that a commanding officer "stands in the same position as a federal magistrate issuing a search warrant." *United States v. Sam*, 22 U.S.C.M.A. 124, 127, 46 C.M.R. 124, 127 (1973). Consequently, the military officer's decision to authorize a search on probable cause must be made with "a magistrate's neutrality and detachment." *Id.* Or, to put it in the words of the Manual in describing the necessary quality of an officer delegated the power to authorize searches, the magistrate function in the military must be exercised by an "impartial person." Paragraph 152, MCM. The search authority must be exercised with "a 'judicial' rather than a 'police' attitude to the examination of the operative facts." *United States v. Drew*, supra at 454, 35 C.M.R. at 426.

*Id.* at 113–14, 48 C.M.R. at 674–75. *Accord, United States v. Guerette*, 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975).

This principle was reaffirmed recently by this Court in *United States v. Ezell*, 6 M.J. 307 (C.M.A.1979). After quoting from the above segment of *Staggs*, and discussing it as well as *Guerette*, the Court there concluded:

> Thus, no person purporting to act contemporaneously as judge, magistrate or any other official exercising the warrant authority on the one hand, and as policeman or prosecutor on the other, may escape the strictures of the Fourth Amendment.

*Id.* at 315 (footnote omitted).

■ Government counsel have argued for what they consider a prospective applica-

tion of *Ezell*. Indeed, in its summary disposition of *United States v. Johnson*, 8 M.J. 233 (C.M.A.1980),[4] the Court stated that *Ezell* "applies only to searches conducted after April 9, 1979, the date of our *Ezell* opinion. *Williams v. United States*, 401 U.S. 646, 91 S.Ct. 1148, 28 L.Ed.2d 388 (1971)." The Supreme Court decision cited in *Johnson* fully supports a prospective application of any portions of *Ezell* which are more than a restatement of prior law. *Accord, Desist v. United States*, 394 U.S. 244, 89 S.Ct. 1030, 22 L.Ed.2d 248 (1969); *Kaiser v. New York*, 394 U.S. 280, 89 S.Ct. 1044, 22 L.Ed.2d 274 (1969); *Linkletter v. Walker*, 381 U.S. 618, 85 S.Ct. 1731, 14 L.Ed.2d 601 (1965). However, the only portion of *Ezell* which is *readily* identifiable as a departure from prior law involves the Court's announcement that, if commanders who purport to act as magistrates in authorizing a search, are then present for the search, such presence will imply "that the commander has been engaged in law–enforcement activities throughout his participation in the entire authorization process, except in very extraordinary situations." *United States v. Ezell, supra* at 319. Insofar as *Ezell* insists that a commander be neutral and detached if he is to authorize a search, *Ezell* simply reaffirms well–established doctrine.

### III

Thus, the question before this Court is whether, under the facts of this case, Captain Moncure was neutral and detached in making his decision that probable cause existed to conduct a search of the person and of the living area of the appellant. A careful analysis of the facts leading to the holdings in *Staggs* and *Guerette* implies what our answer must be.

### A

In *United States v. Staggs, supra*, the authorizing official—the station judge ad-

---

4. On petition for reconsideration filed by appellant defense counsel on January 31, 1980, this Court affirmed the *Johnson* order by an equally divided vote. 9 M.J. 262 (1980). In one view, that vote by an equally divided Court leaves the

original decision intact as the law of the case but not as precedent for other cases. *United States v. Fimmano*, 9 M.J. 256 (1980) (Memorandum Opinion of Everett, C. J.).

vocate who had been delegated search--authorization power by the commander—was approached by a special agent of the Naval Investigative Service (NIS) named Stovall with information concerning the accused's drug involvement and with a request for a search authorization. Based on what Stovall had told him, the judge advocate himself dictated the affidavit, subsequently signed by Stovall, setting forth this information. Notwithstanding his conclusion that the information then available was too stale to constitute probable cause to believe that the marihuana in question would then be found at the accused's residence, the judge advocate, on the basis of the affidavit, issued a command authorization for a search of the accused, his residence, and his automobile for marihuana, any other controlled drug, and marked currency of the United States. However, the authorization was subject to " 'subsequent corroboration' " in the form of a controlled buy to be made by the informant later that same evening.[5]

Early that evening, Stovall called the judge advocate with the news that the controlled purchase had been accomplished, and with the additional news that the accused had, in the course of that transaction, indicated to the informant that additional marihuana would be available later that same night. Stovall wondered whether the judge advocate wished the search authorization to be executed immediately, since the corroboration condition had then been fulfilled, or whether it should await the later opportunity to effect still another purchase. The judge advocate told Stovall to do whatever he wanted· specifically, he told him that they could wait to attempt the additional purchase but that, in any event, the authorization must be executed before midnight that day. Ultimately, Stovall decided to wait and the second purchase was made after nine o'clock that night. Without further contacting the judge advocate, Stovall and other NIS agents went to the accused's

residence, searched both his person and the premises, and found a substantial amount of controlled substances.

In addition to these facts surrounding the incident leading to trial, one other matter contributed to the Court's decision in *Staggs*. Some five months earlier, this same judge advocate had traded information about the area drug traffic with an accused in another case in return for clemency; that information had implicated the accused in the local drug scene. As a result of this news, the judge advocate had ordered law enforcement agents to conduct an investigation into Staggs' activities, but the investigation had proved inconclusive. Nonetheless, when the accused's name was surfaced by Stovall in this case, the judge advocate "immediately" remembered it in connection with the earlier investigation and, shortly after the accused's ultimate arrest, the judge advocate "was heard to say 'we'd been after him' for some time." *United States v. Staggs, supra* at 113, 48 C.M.R. at 674.

In its legal analysis, the Court was careful to point out that the fact that the authorizing official had ordered the investigation as part "of his official duties, . . . standing alone does not amount to participation in the process of investigation divesting him of lawful authority to order a search upon probable cause." Further, the Court indicated its awareness "that a commander's responsibilities for the maintenance of order and discipline in his command requires that he direct and sometimes participate in investigations into criminal activities." And the Court specifically recognized that, ordinarily, the commander could adequately separate this responsibility from his authority to make probable cause determinations as a predicate to approving a search or seizure request.

Nonetheless, the Court held:

What the fact pattern displays, then, is an initial failure of probable cause and

---

5. The opinion reflects that it was Stovall who had proposed that the informant was available to make the "controlled purchase from the [accused], and that the ... judge advocate be-

lieved such 'corroboration' was needed 'to round out the probable cause.' " *United States v. Staggs*, 23 U.S.C.M.A. 111, 112, 48 C.M.R. 672, 673 (1974).

the person acting as a magistrate participating in designing a plan to produce a probable cause situation. Joining this activity, his assistance to the agent in preparing the affidavit, and the stated history of the investigation and comments concerning appellant, we do not believe that the search in this case was authorized by a person of the requisite impartiality, neutrality, and detachment.

What distinguished this case from the norm, concluded the Court, was that

the evidence indicates that the station judge advocate departed from his normal role and *became an active participant in gathering evidence against the accused.* That participation was inconsistent with his duty to remain an impartial and detached magistrate.

*Id.* at 114, 48 C.M.R. at 675 (emphasis added).

### B

In *United States v. Guerette, supra,* the search–authorizing official had assumed command some four months before the search in question. Since first taking charge, he had received periodic briefings from a security police sergeant on base concerning the use of marihuana there. He became aware during this period that such use, instead of being a problem confined to the barracks, was becoming more open and flagrant all the time. As a result, he ordered the sergeant to begin compiling names and data concerning this marihuana use. They also, in the interim, became aware "of the possibility that 'hard drugs' were being used."

Within a month, the commander realized that marihuana use had become blatant in his command. He testified that "the troops would start going to their supervisors and complaining that they could not go anywhere without being confronted with the use of marijuana." Therefore, the commander decided it was time to call in the agents of the Office of Special Investigations (OSI). However, both the OSI and the Social Actions officer at his major command kept telling "the same story, that we had to get names, we had to get an indication of who had marijuana in their possession before the police would move."

Following his frustrated efforts to involve law enforcement agents, the commander called in the security sergeant and told him that he was greatly concerned because the problem was no longer a hidden one and that the troops themselves were complaining about being constantly confronted with it. Therefore, the day following the commander's contact with the OSI and the Social Actions officer, the sergeant prepared for the commander's signature a letter to the sergeant requesting that certain named individuals be subjected to a confidential investigation. The accused's name was placed on the list because some time earlier some civilians, who were thought to possess marihuana, had been in the accused's company at a party at the NCO club.

Two days later, the sergeant came to the commander with news that a confidential informant had advised that there was marihuana located in the accused's car. The commander testified that "based on the experience I had working with [the] Sergeant '... for the past four months, I had a reasonable feeling that he had, in fact, found marijuana and I authorized a search, signed the search warrant." *Id.* at 283, 49 C.M.R. at 532.

After initially reiterating the language from *Staggs* that an authorizing official is not rendered partial by the mere fact that, in the performance of his duties, he orders "an investigation into suspected activity by an accused," *id.* at 282, 49 C.M.R. at 531, the Court held that the commander there

did not abandon his impartiality in considering the request for authority to search. Furthermore, his testimony supports no conclusion or even inference that he *became personally involved as an active participant in gathering evidence against accused.*

*Id.* at 283, 49 C.M.R. at 532 (emphasis added).

## IV

■ What *Staggs* and *Guerette* teach is that, while a commander, acting within his official duties, may order an investigation into activities of a suspect and still retain the requisite neutrality and detachment to authorize later a search based on information developed as a result of that investigation, he may *not* become personally involved in the actual evidence–gathering process. *Accord, United States v. Ezell, supra.* If he does become "engaged in the often competitive enterprise of ferreting out crime," *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed.2d 436 (1948), he thereby loses the objectivity and impartiality constitutionally required of an official who authorizes a search based on probable cause. *United States v. Ezell, supra.*

■ Unfortunately, that is the fate which befell Captain Moncure here. By himself taking the tip relayed to him by his squadron commander from a neighboring battalion commander and himself investigating the original anonymous source of that information in order to establish the probable cause necessary to support a search request, Captain Moncure assumed the role of a law enforcement agent developing evidence against a suspect.[6] While Captain Moncure may well have felt responsible, as the appellant's immediate commander, for personally following up this tip, by doing so in this manner he risked disqualifying himself from later weighing the evidence he had helped develop.

At that point Captain Moncure's safest course would have been to seek search authorization from one of his own superiors in the chain of command or from a military magistrate. In that event he could have presented the information that he had accumulated and which he thought would be adequate to establish probable cause.

We need not decide whether his investigatory activities were in themselves sufficient to demonstrate that Captain Moncure had become too involved in the law enforcement endeavor to possess the neutrality and detachment necessary for him validly to authorize a search. His pre–search involvement must be considered in tandem with his participation in and direction of the search itself.[7] Taken all together, Captain Moncure's involvement in the events which preceded and accompanied the search preclude a finding that he was qualified to perform in this matter the responsibilities of a "magistrate."

## V

■ Government appellate counsel have suggested that even if the search authorization were invalid, the search could be sustained because of exigent circumstances which excused the necessity to seek permission to search from a magistrate or a commander. This argument relies heavily on the proximity of the appellant's unit to the German border. Under the circumstances of this case, that proximity alone is not adequate to show exigent circumstances which might exempt the search from the requirement of prior authorization. No

---

**6.** The Government seeks to avoid this result by distinguishing activity to investigate a *suspect himself* from activity to investigate an *informant* so as to determine his reliability. Specifically, government counsel argues that Captain Moncure "did not develop a scheme for establishing probable cause but merely sought to verify the accuracy of information provided to him." But that *is* establishing probable cause, and when the commander *himself* goes about digging up this knowledge—as opposed to simply pointing out to an applicant for a search authorization what the defects are in his basis for the application—the commander leaves the judicial role and undertakes the policeman's.

**7.** It is not inconsistent with the prospectivity of *Ezell* to consider events accompanying or even subsequent to the search in determining whether the commander was "neutral and detached" at the time he authorized the search. *Cf. Lo–Ji Sales, Inc. v. New York*, 442 U.S. 319, 326–28, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). Thus, in reversing one of the convictions involved in *United States v. Ezell*, the Court noted, 6 M.J. 307, 322 (C.M.A.1979) (footnote omitted):

> By personally conducting the search and seizing the items whose admission was challenged, Major Moi revealed that he had been engaged in law enforcement activities throughout his participation in the entire authorization process.

showing has been made that Captain Moncure could not have obtained readily from Lieutenant Colonel Conrad an authorization to make the desired search.

## VI

The decision of the United States Army Court of Military Review is reversed. The findings and the sentence are set aside and the charge is dismissed.

Judge FLETCHER concurs.

COOK, Judge (dissenting):

At trial, the accused challenged the admissibility of evidence obtained in a search on the ground that probable cause did not exist to justify Captain Moncure's authorization to search. Neither directly nor indirectly did the accused assert that Captain Moncure was disqualified to issue an authorization because he had become "personally involved ... in the investigative or prosecutorial process against the accused." *United States v. Ezell*, 6 M.J. 307, 318 (C.M. A.1979). In my opinion, the failure to interpose objection at trial to Captain Moncure's actions on the ground of personal disqualification precludes the accused from urging that objection, for the first time, in this Court as a ground for reversal of his conviction. *See* my opinion in *United States v. Ezell, supra* at 332, 335.

Turning to the merits, as the principal opinion refers extensively to *United States v. Guerette*, 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975), and *United States v. Staggs*, 23 U.S.C.M.A. 111, 48 C.M.R. 672 (1974), I assume that the majority have not repudiated the *Staggs* declaration that the decision in that case was not "intended to invalidate this long–standing practice" that permitted a commanding officer to issue a warrant, although he might concurrently have been required, by his responsibilities for the maintenance of order and discipline in his command, to "participate in investigations into criminal activities." *United States v. Staggs, supra* at 114, 48 C.M.R. at 675. To me, the *Staggs* declaration recognizes that a commanding officer is not *eo instante*

disqualified from authorizing a search because he has earlier taken an action that could be described as investigative. A second factor must be considered before a determination of disqualification can be made; that factor is whether, because of his investigative action, the commander is likely "not to hold the balance nice, clear, and true between the State and the accused." *Connally v. Georgia*, 429 U.S. 245, 249, 97 S.Ct. 546, 548, 50 L.Ed.2d 444 (1977), cited in my opinion in *United States v. Ezell, supra* at 331. An important element in a decision on that issue is the motivation and intention of the commander at the time of an action that could be regarded as investigative. I am certain that, had the accused challenged Captain Moncure's qualification at trial, more direct evidence as to the Captain's motivation and intention would have been introduced than presently appears in the record. Based on what I find in the record, I am satisfied that Captain Moncure did not abandon his role of a commander concerned with the order and discipline of his command to adopt the character of a criminal investigator. *United States v. Smallwood*, 22 U.S.C.M.A. 40, 46 C.M.R. 40 (1972). I conclude, therefore, that he was qualified to issue the authorization to search.

I would affirm the decision of the Court of Military Review. In doing so, I think it appropriate to comment briefly on the statement in Judge Felder's opinion, for a unanimous court, that "[a] commanding officer need not be a neutral and detached magistrate."

One of the accused's assignments of error before the Court of Military Review was that the search had been "authorized by a commander who was not a neutral and detached magistrate." The argument in support of the assignment was to the effect that the duties and responsibilities of any commander are such as to disqualify him as a person constitutionally able to authorize a search. Accused's counsel called attention to the pendency of the *Ezell* cases in this Court, as follows:

The question of a commander's disqualification to issue search warrants due to the nature of his position *qua* commander is currently under review by the United States Court of Military Appeals. *United States v. Ezell,* 6 M.J. 307 (*petition granted* 23 December 1975); *United States v. Hunter,* 7 M.J. 287 (*petition granted* 20 August 1976). Appellant submits that that review will surely result in the disqualification of such commanders as "neutral and detached magistrates."

Appellate Government counsel countered the defense argument with the contention that the battery commander "was not *per se* rendered partial by virtue of being a commanding officer." Among the cases cited in support was *Guerette*, which, as noted earlier, confirmed a commander's inherent qualification to authorize a search, but recognized that personal participation in police and prosecutorial processes could disqualify him in a particular instance.

In the context of the respective arguments on the accused's contention before the Court of Military Review, it is clear to me that Judge Felder's remark was not a declaration of principle opposed to disqualification of a commander because of his prior action as an investigator or prosecutor, but was simply a rejection of the contention that the scope and variety of a commander's duties and responsibilities automatically preclude him from authorizing a search. The *Ezell* cases, which were decided almost four months later, also rejected that contention. Yet, the majority seem to view Judge Felder's remark as indicating that the Court of Military Review decided the question of Captain Moncure's qualification to authorize a search on the basis of an erroneous principle of law. I do not believe it did so; after the statement, the court's opinion went on to examine what the commander did, and it pointed out that, among other things, "he commendably sought the advice of a judge advocate." In any event, if the court did err in its statement, the facts of record still speak for themselves; and, as I earlier indicated, the message they convey to me is that Captain Moncure was not disqualified.