UNITED STATES, Appellee,

v.

Marvin MURRAY, Private First Class,
U. S. Army, Appellant.

No. 36,298.
SPCM 12816.

U. S. Court of Military Appeals.

Dec. 14, 1981.

For Appellant: *Colonel Edward S. Adamkewicz, Jr., Major Benjamin A. Sims, Captain Willard E. Nyman, III* (on brief); *Major James F. Nagle, Captain James Recasner, Captain Terrence L. Lewis.*

For Appellee: *Colonel Thomas H. Davis, Colonel R. R. Boller, Captain Robert D. Newberry* (on brief); *Captain Richard A. Kirby.*

*Opinion of the Court*

EVERETT, Chief Judge:

A special court-martial composed of a military judge alone tried and convicted appellant, notwithstanding his pleas, of possession of "an unknown quantity of" heroin, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. Thereupon, the court sentenced appellant to a bad-conduct discharge, confinement at hard labor for 3 months, forfeiture of $240 pay per

month for 5 months, and reduction to the lowest enlisted grade. The convening authority approved these results and the United States Army Court of Military Review affirmed in an unpublished memorandum opinion.

I

The first issue on which this Court granted appellant's petition for review (6 M.J. 129) correctly urges that his company commander, who authorized the search which located the heroin, was so inextricably involved in the scheme leading up to the search and in the search itself that he lacked the objectivity and neutrality required of an authorizing official.

One evening Specialist Four Montgomery, a fellow soldier in appellant's unit, approached appellant's company commander, Captain McCarter, and advised him that Murray and a Private Berry had some heroin in appellant's room which they were willing to sell. Previously, when Montgomery had become involved in drug abuse, the captain had urged him to turn informant and had "told him if he could provide information to enable us to make a bust, to find someone dealing in drugs, that he could possibly get a Chapter 10 [administrative discharge]." Upon receiving the tip from Montgomery, McCarter telephoned the local Criminal Investigation Division (CID) office and two agents responded to the call. Together with McCarter, they listened to Montgomery relate that he had seen the heroin in appellant's room and that he could make a buy. Thereupon, McCarter "said 'all right, let's try to make a controlled sale.' "

Always using the first person plural pronoun "we," McCarter then testified about the subsequent events. The agents gave Montgomery marked money with which to make the purchase, searched him, and took him to appellant's billets. They waited across the street where they could see appellant's room window, as well as the front door, while Montgomery went inside to accomplish his deed. Within five minutes, however, Montgomery returned without success because appellant was then at a movie. The agents took the money back from Montgomery and the group separated, to meet again when the movie would be over. This they did at about 10:30 p. m.; on this occasion Montgomery returned with "two hits of heroin," which he said he had bought. He further revealed that more heroin was still in the room in a yellow matchbox from the Titanic Disco.

At this point, McCarter authorized a search of appellant's room. He explained, "[I]f there was more heroin then I wanted to try to get it out." Again speaking in terms of "we," McCarter described how they all then went across the street to appellant's room, where they were admitted by use of Montgomery's nickname ("Bugs") to identify themselves. Inside the room were Berry, who had answered the door, appellant, and his roommate, PFC Flood, who was asleep at the time. Appellant was standing next to a partly open wall locker. The agents immediately began to search appellant and Berry, but they did not find the matchbox. While CID Agent Gates searched in the area of the desk, Captain McCarter began to search the wall locker "from the top to the bottom"; he found the matchbox on the top shelf and saw heroin inside. The marked money was also located during the search of the room—although the testimony is conflicting as to when and where this discovery occurred. With the matchbox and heroin still in his possession, McCarter and the others proceeded to the military police station, where he turned the contraband over to Mr. Gates.[1]

Under these facts we are compelled to conclude, as appellant has urged, that Captain McCarter had personally been "engaged in the often competitive enterprise of

1. There was some question raised at trial whether the specification upon which appellant was tried and convicted was intended to include the heroin that Montgomery bought during the controlled purchase, or only that found in appellant's locker. However, the Government chose to rely only on the drugs seized in the search of the room; so the judge did not receive in evidence the two packets which Montgomery had purchased.

ferreting out crime." *Johnson v. United States*, 333 U.S. 10, 14, 68 S.Ct. 367, 369, 92 L.Ed. 436 (1948). Accordingly, he thereby lost "the objectivity and impartiality constitutionally required of an official who authorizes a search based on probable cause. *United States v. Ezell*, [6 M.J. 307 (C.M.A. 1979)]." *United States v. Rivera*, 10 M.J. 55, 61 (C.M.A.1980). *See United States v. Guerette*, 23 U.S.C.M.A. 281, 49 C.M.R. 530 (1975); *United States v. Staggs*, 23 U.S.C. M.A. 111, 48 C.M.R. 672 (1974). In the fullest sense, McCarter was the policeman in charge of the operation. Not only had he recruited Montgomery as an informant in the first place, but he made the decisions to proceed with the investigation by attempting a controlled purchase, to conduct the search, and to enlarge its scope when search of appellant's person proved unproductive. Besides participating in the search itself, he retained custody of the fruits of that endeavor until the search party reached the military police station. As in *Rivera*, Captain McCarter may well have felt responsible as a good commander for following up Montgomery's lead himself and for personally directing the factual development of that lead, but "by doing so in this manner he risked disqualifying himself from later weighing the evidence he had helped develop." *United States v. Rivera, supra.*

## II

Sometimes "exigent circumstances" will justify an arrest or search, even though otherwise a warrant would be required. *Cf. Steagald v. United States*, 451 U.S. 204, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981); *Payton v. New York*, 445 U.S. 573, 100 S.Ct. 1371, 63 L.Ed.2d 639 (1980). In *United States v. Stuckey*, 10 M.J. 347, 361 n.18 (C.M.A.1981), it was pointed out:

Under truly "exigent circumstances" the commander, like anyone else having law enforcement responsibilities, can per-

form or authorize a search which does not rely for its legitimacy on his control over the place or person affected.

Thus, "exigent circumstances" were deemed to justify the apprehension involved in *United States v. Phinizy*, 12 M.J. 40 (C.M.A.1981) (Fletcher, J.).

In the case at bar, the military judge was apparently impressed by the defense contention that Captain McCarter was not neutral and detached and so could not authorize the search. In upholding the admissibility of the matchbox and its contents, he remarked:

However, I believe that the totality of the circumstances here do support the exigent theory that would allow a search even without a warrant and that the exclusionary rule wouldn't prohibit the introduction of the evidence in this case. Considering such factors as the presence of other people in the room so far as the exigency goes; the good faith belief that the commander had the authority to authorize a search at this time; the nature of the evidence that you're dealing with, drugs, also is some of the considerations, and I've certainly not stated them all.

■ While the question is close, we conclude that the record sustains the trial judge's determination that "exigent circumstances" justified the search of the wall locker. The objects of the search—the matchbox, its contents, and the marked money—were small and could be readily destroyed or concealed. Moreover, Murray's roommate was present in the room, which was located in a large barracks.[2]

■ "Law enforcement authorities can properly take reasonable measures to assure that, until reasonable investigative steps can be completed, evidence is not destroyed, crime scenes are not disarranged, and suspects do not flee." *United States v. Glaze*, 11 M.J. 176, 177 (C.M.A.1981). Among the

---

**2.** The military judge in his ruling adverted to the good faith of the CID agents, who believed that they had received lawful authority for a search, and the good faith of the persons performing a search has been relied on by one Court of Appeals in determining whether the exclusionary rule should be applied. *See United States v. Williams*, 622 F.2d 830 (5th Cir.

1980) (en banc), *cert. denied*, 449 U.S. 1127, 101 S.Ct. 946, 67 L.Ed.2d 114 (1981). *Cf. Michigan v. DeFillippo*, 443 U.S. 31, 99 S.Ct. 2627, 61 L.Ed.2d 343 (1979). In this case, we choose not to rely on any subjective good faith of the CID agents; but if bad faith of the investigators had been shown, we would be more inclined to reach a different result.

"reasonable investigative steps" contemplated in *Glaze* is obtaining from a commanding officer or military magistrate an authorization to search or to apprehend. This right of investigators to take other "reasonable measures" to avoid destruction of evidence must be taken into account in determining whether an "exigency" exists which would justify an immediate search.

■ We note, however, that the Supreme Court has not yet established a universal rule that a warrant must be obtained for a search if it is feasible to obtain a warrant. *Cf. United States v. Edwards*, 415 U.S. 800, 94 S.Ct. 1234, 39 L.Ed.2d 771 (1974); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970); *Abel v. United States*, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668 (1960).[3] In some of the cases where there has been insistence on a warrant, "freezing" of the status quo until a search warrant was obtained would have been much easier and more convenient to accomplish than apparently would have been true in the case at hand. *Cf. Arkansas v. Sanders*, 442 U.S. 753, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979); *United States v. Chadwick*, 433 U.S. 1, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977). Furthermore, "freezing" of the status quo is itself a limitation on the personal rights of those affected thereby, *cf. Chambers v. Maroney, supra,* 399 U.S. at 52, 90 S.Ct. at 1981. For example, here not only would the rights of appellant have been affected but also those of his roommate, PFC Flood, who was sleeping in the room at the time. Moreover, since it is unclear how much time would have been needed to locate a magistrate or a commander who was not disqualified to authorize a search, there is no certainty as to the length of the period during which it would have been necessary to keep the status quo in the room "frozen." In light of all the circumstances, the existence of feasible alternatives to an immediate search is not so readily apparent as to compel rejection of the military judge's determination of exigency.

**3.** Admittedly some of these cases can be readily distinguished: for example, a delayed automobile search can be justified in terms of the lesser expectations of privacy in a car. *See Arkansas v. Sanders*, 442 U.S. 753, 761, 99

## III

Upon consideration of the controlling precedents, we also resolve against appellant the other issues (6 M.J. 129) on which review was granted. Accordingly, the decision of the United States Army Court of Military Review is affirmed.

Judge COOK concurs.

FLETCHER, Judge (concurring in the result):

For the reason stated in my opinion in *United States v. Phinizy*, 12 M.J. 40 (C.M.A. 1981), I conclude the immediate entry of Captain McCarter and the military policemen into this barrack's room and the subsequent arrest of the appellant was lawful under the circumstances of the present case. In *Phinizy*, the lawfully-arrested suspect was searched and the marked money was found on his person. *See United States v. Robinson*, 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973). Here, the challenged evidence was seized after a search of appellant's wall locker. However, the testimony of Gates, the arresting military policeman, indicates that at the time of the entry and arrest appellant was standing next to this partially opened locker. Captain McCarter searched the wall locker and discovered on the top shelf an open package containing several matchbooks and a plastic matchbox containing the heroin. This search was conducted in an area within appellant's immediate control and so it was lawful. *Chimel v. California*, 395 U.S. 752, 763–65, 89 S.Ct. 2034, 2040–41, 23 L.Ed.2d 685 (1969); *but see United States v. Hessler*, 7 M.J. 9, 11 n.9 (C.M.A.1979). The plastic matchbox was then immediately opened and the suspected heroin discovered. This police action was also reasonable. *See New York v. Belton*, 453 U.S. 454, 101 S.Ct. 2860, 2864, 69 L.Ed.2d 768 (1981). *Cf. Robbins v. California*, 453 U.S. 420, 101 S.Ct. 2841, 69 L.Ed.2d 744 (1981).

S.Ct. 2586, 2591–92, 61 L.Ed.2d 235 (1979). However, the fact remains that a warrantless search has been upheld even when a warrant could have been obtained with minimal exertion and inconvenience for the police.