UNITED STATES, Appellee,

v.

Angel L. CORDERO, Specialist
Four U.S. Army, Appellant.

No. 50,734.

CM 443681.

U.S. Court of Military Appeals.

June 23, 1986.

For Appellant: *Captain Annamary Sullivan* (argued); *Colonel William G. Eckhardt, Lieutenant Colonel William P. Heaston, Captain Harry L. Williams, Jr.* (on brief); *Colonel Brooks B. LaGrua, Major Eric T. Franzen, Captain Michael D. Graham.*

For Appellee: *Lieutenant Colonel Larry D. Williams* (argued); *Colonel James Kucera* and *Lieutenant Colonel Adrian J. Gravelle* (on brief).

*Opinion*

EVERETT, Chief Judge:

A general court-martial composed of officer and enlisted members tried appellant at Fort Ord, California, on a charge that on May 22, 1982, he murdered his son, Angel Cordero, Jr., in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918. Appellant pleaded not guilty, but he was convicted of the lesser-included offense of involuntary manslaughter by culpable negligence, in violation of Article 119, UCMJ, 10 U.S.C. § 919. The sentence of dishonorable discharge, confinement for 3 years, total forfeitures, and reduction to the grade of E-1 was approved by the convening authority.

After the Court of Military Review affirmed the findings of guilty and the sentence, we granted review of this issue:

WHETHER THE MILITARY JUDGE DENIED APPELLANT HIS RIGHT OF CONFRONTATION BY ADMITTING THE OUT–OF–COURT STATEMENTS RENDERED BY THE OTHER PRINCIPAL SUSPECT OF THE OFFENSE.

## I

### A

In October 1981 appellant married Claudia, an 18-year-old German girl, whom he had met while assigned overseas. Soon thereafter, he arranged to obtain custody of Angel Cordero, Jr., his illegitimate child, who was then in a foster home in New York. On April 15, 1982, after he had been placed with appellant at Fort Ord, Angel, Jr., was the victim of extensive child abuse by his stepmother; as a result he was treated in the hospital on post. At that time, appellant was away on temporary duty.

On May 22, 1982, an ambulance rushed to appellant's quarters at Fort Ord in response to an emergency call that Angel, Jr., had drowned in the bathtub. Although the paramedics promptly rendered first-aid, they were unable to resuscitate the 29-month-old child.

According to the Corderos, the death had been an accident. At that time appellant's account was that the child had wet his pants and, as a result, Claudia had placed him in a bathtub containing 8 to 10 inches of water, leaving him there alone—apparently as a disciplinary measure. When she had returned, the child was lying on his side underwater. Thereupon, appellant had tried unsuccessfully to administer cardiopulmonary resuscitation (CPR).

Investigators noticed, however, that Angel's body contained various bruises and other signs of possible abuse. Therefore, on May 24, appellant was interviewed by Criminal Investigation Command (CID) agents, seeking further details about Angel's death. At that point, because of her prior child abuse, Claudia was suspected of homicide. However, appellant—who had been absent on April 15 when the earlier child abuse had occurred—was not suspected of any crime and so was not given any warnings by the investigators pursuant to Article 31(b), UCMJ, 10 U.S.C. § 831(b).

After appellant initially claimed that the death was an accident, the agents pointed out that this explanation was implausible. Appellant then stated that while in the living room he had heard crying, splashing sounds, and a "thudding" noise from the bathroom. Shortly thereafter, Claudia had left the bathroom; and when she had returned there a short time later, he had heard her scream. When he ran to the bathroom, he found Angel, Jr., lying underwater in the tub. Later that evening, Claudia had told appellant that she had thrown Angel in the tub and, when he had tried to get out, had held him underwater.

Claudia was then confronted with appellant's new version, which attributed the death not to an accident but to her abuse of the child. She responded by claiming that, after Angel had soiled his pants, she and appellant had taken him to the bathroom and had placed him in the tub. Appellant had held the child's head underwater; and when she had asked him to release the boy before he drowned, appellant had told her to shut up, that he knew what he was doing, and to leave the room. She complied; and when she returned several minutes later, Angel was submerged in the water. Responding to her call, appellant had run back to the bathroom and had tried unsuccessfully to revive the boy.

Unable to budge Claudia from this story, the investigators questioned appellant further. Now he was a suspect and was warned of his rights. On this occasion, Cordero admitted pushing Angel's head under the water, but said that he had released him and had left him lying in the tub. Appellant denied having killed the boy; and he added that he knew Angel was alive when he left the bathroom.

### B

At a session under Article 39(a), UCMJ, 10 U.S.C. § 839(a), prior to trial, the de-

fense attempted to suppress appellant's statements to the CID agents on the ground that initially he should have been warned of his rights under Article 31(b). The military judge ruled, however, that Cordero had not been a suspect at the outset, so there was no obligation to give such a warning when he was first interviewed; and the investigators had satisfied their legal obligation by giving him a suitable warning as soon as he became a suspect.

During this same Article 39(a) session which took place in August 1982, defense counsel requested that appellant be released from pretrial confinement. In this connection, he pointed out that, when Cordero had originally been placed in confinement, Claudia was slated to be a government witness and was living in the family quarters. However, "[s]ince then, information has become available to both the defense and the Government that Claudia Cordero is no longer living in the Cordero residence, in fact, there is some difficulty getting ahold of her at all." Thus, the defense contended that, because she was no longer in the area, no reason existed for appellant to be confined further before trial. Although opposing appellant's release from pretrial confinement, trial counsel conceded that "it's true we don't know the exact location of Mrs. Cordero."

When court reconvened a month later, Claudia was not present; and defense counsel moved *in limine* to suppress extrajudicial statements she had made to the investigators. The defense contended that she was not "unavailable" within the meaning of Mil.R.Evid. 804, Manual for Courts-Martial, United States, 1969 (Revised edition); that her statements were not reliable, as would be required for admission under Mil. R.Evid. 804(b)(5); and that admission of her statements would violate appellant's sixth-amendment right of confrontation. In support of his motion, defense counsel asserted that Claudia had been traced to Germany and that, in conversations with trial counsel, her civilian public defender had indicated that she would be willing to attend appellant's trial if the Government

provided the cost of transportation and also granted her immunity. The Government submitted a written response to the defense motion *in limine*, which recited these facts:

The accused and his wife were brought to the CID office at Fort Ord, California on Monday, 24 May 1982. During that day Mrs. Cordero was questioned about the death of Angel Cordero, Jr. and indicated that her husband, the accused, had murdered his son. She also admitted to abusing the child by biting him on two separate occasions. Two days later Mrs. Cordero's statement was reduced to writing and signed under oath. It was made freely, without duress or promise of reward. It has not been recanted or contradicted.

The accused rendered two written statements. In the first statement he denied his guilt. In the second statement he admitted that he did push his son's head into the water as his wife had stated. The accused was placed in pretrial confinement on 24 May 1982. His wife, Claudia Cordero, continued to reside at the family residence at 511 Hayes Circle, Fort Ord, California. On 10 August 1982, she was served with a subpoena by SP4 Anthony Robinson of the Office of the Staff Judge Advocate. Prior to the first trial date, 19 August 1982, the prosecution learned through defense counsel, CPT Pocker, that Mrs. Cordero had left the residence in a green pickup which had California license plate 1855377 or I855377. CPT Thomas Keller, Military Police Operations Officer, Fort Ord, California, was immediately contacted and asked to identify the owner of the green pickup. CPT Keller was able to determine that no vehicle bore either the license plate given or any variation of that license plate. Since that date Mrs. Cordero has not been seen at her residence.

On 17 September 1982 the government received the phone records of the accused. Contained within the phone records are phone numbers in Germany.

The government attempted to call these numbers but was unsuccessful. On 20 September 1982, with the assistance of defense counsel, CPT Pocker, the government was able to obtain the phone number of Mrs. Margaret Thomas. Mrs. Thomas informed the prosecution that Claudia Cordero had in fact returned to her home in Germany and gave us her German phone number.

Defense counsel disputed the prosecutor's assertion that Claudia's statement had not "been recanted"; and he noted that there would be evidence of subsequent inconsistent statements made by her "in which she claimed not to have been in the bathroom or not to know what happened." The defense also pointed out that in July 1982, she had pleaded guilty in a Federal district court to having abused Angel on May 22, 1982.[1]

The military judge then ruled "that, pursuant to" Mil.R.Evid. 804(a)(5), Claudia was "unavailable to testify and" that her statement was admissible as "an exception to the hearsay rule." Moreover, he continued:

I further find that even if Claudia Cordero were not unavailable, her written statement, which, I believe, is Prosecution Exhibit 11 for identification, would be admissible under Rule 803, parenthesis, (24). I specifically find that Prosecution Exhibit 11 for identification has equivalent circumstantial guarantees of trustworthiness, and I specifically find that the statement is offered as evidence of a material fact, that the statement is more probative on the point for which it is offered than any other evidence which the Prosecution can procure through reasonable efforts; and, finally, that the

general purposes of these rules and the interest of justice will best be served by admission of this statement into evidence.

### C

When trial commenced before the members, the Government offered medical and other evidence concerning the circumstances of Angel's death; testimony by CID agents and by an FBI agent about their investigation; oral and written statements made by appellant; and a four-page sworn statement of Claudia Cordero.[2]

The defense, on the other hand, offered evidence that appellant was a peaceable person and a loving father and that Claudia disliked and abused her stepson and was unreliable. The purport of the defense evidence was that Claudia had caused the child's death and that any incriminating admissions by appellant were solely the result of efforts on his part to cover up his wife's guilt.

Testifying in his own behalf, appellant claimed that on May 22, he had found that his wife was abusing Angel, who then was in a tub of scalding water. Infuriated by her conduct, he had cursed her, attempted to hit her, and chased her out of the bathroom. At that point, he had broken down emotionally and had spent the next 30 minutes trying unsuccessfully to call a brother in Hawaii and a sister in New York with a view to obtaining consolation and advice. Meanwhile, Angel was crying. Finally, Claudia screamed from the bathroom; and appellant returned there to find that Angel had drowned. Thereupon, Cordero attempted to resuscitate him and continued in this effort until the paramedics arrived and took over the task.

---

1. During the trial, the defense offered copies of court records showing that Claudia Cordero had pleaded guilty in San Jose United States District Court to a charge alleging that on May 22, 1982, she had inflicted on Angel Cordero, Jr., "cruel and inhuman corporal punishment and injury resulting in a traumatic condition, in violation of California Penal Code, Section 273d" as incorporated by 18 U.S.C. Section 13, the Assimilative Crimes Act.

2. As read into the record, the statement covers seven pages. According to the Manual for Courts-Martial, this statement should not have been given to the court-members for use during their deliberations. *See* App. 8, p. A8–19, fifth note, Manual for Courts-Martial, United States, 1969 (Revised edition); R.C.M. 702(a), Discussion (fourth paragraph) and R.C.M. 811(f), Manual for Courts-Martial, United States, 1984.

The military judge instructed the court members as to murder and various lesser-included offenses: voluntary manslaughter, involuntary manslaughter by culpable negligence, involuntary manslaughter in the course of an assault and battery, negligent homicide, aggravated assault, and assault and battery. The court members returned the findings of involuntary manslaughter by culpable negligence.

## II

### A

The military judge found that Claudia Cordero was unavailable; but he also found that her sworn statement would have been admissible, even if she had been available. As to the latter point, we do not agree, in light of the restrictions in this regard contained in other rules. For instance, Mil.R.Evid. 801(d)(1) allows admission of a prior statement by a testifying witness only under certain delineated circumstances: (A) if "inconsistent with the declarant's testimony, and ... given under oath subject to the penalty of perjury at a trial, hearing, or other proceeding, or in a deposition"; (B) if consistent and "offered to rebut" a "charge ... of recent fabrication or improper influence or motive"; or (C) if it is "one of identification." Also, admission of "former testimony" given in a proceeding where the witness was subject to cross-examination is specifically authorized only when the declarant is unavailable as a witness, *see* Mil.R.Evid. 804(b)(1). Considering the spirit of these provisions, it is hard to conceive that the drafters of the Military Rules of Evidence contemplated that an extrajudicial statement like Claudia's could be admitted under Mil.R.Evid. 803(24) if the witness were available to testify. Moreover, if Mil.R. Evid. 803(24) was intended to go so far, it seems irreconcilable with the Supreme

Court's view of an accused's right of confrontation under the sixth amendment. *Cf. Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *Mancusi v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *Barber v. Page*, 390 U.S. 719, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968).

■ Insofar as Mil.R.Evid. 804(b)(5) is concerned—which does require the declarant's unavailability—the requirements for establishing unavailability may not be so high as those imposed by the sixth amendment. However, whatever the standard is for establishing Claudia's unavailability, it appears to have been met.[3] She had been subpoenaed by the Government as a witness and did not appear at the specified time. Without contacting trial counsel or leaving a phone number, she departed the United States and returned to her home in Germany. Even though, under the Status of Forces Agreement, the Federal Republic has assumed treaty obligations to cooperate with American military authorities in investigations and trials, we are unaware of any procedure whereby a German national can be compelled to travel to California to testify in an American court-martial. *Cf. United States v. Crockett*, 21 M.J. 423 (C.M.A.1986); *United States v. Bennett*, 12 M.J. 463 (C.M.A.1982) (American national cannot be compelled to testify in an American court-martial conducted overseas).

According to defense counsel, Claudia's civilian public defender had told trial counsel that she would return to testify if the Government would pay the cost of transportation and grant her immunity. If her availability depended only on the Government's payment for her to travel from Germany to Fort Ord, we would consider her to be available—at least, for sixth-amendment purposes. With respect to immunity, the remark by defense counsel did not specify whether Claudia was seeking transac-

---

**3.** Generally, a statement of fact in a pleading—such as the government response to the defense motion *in limine*—is not an adequate basis for establishing that a witness is unavailable. A stipulation, affidavit, or sworn testimony should normally be provided. However, all parties seem to have accepted the recited facts as being accurate and defense counsel proceeded in a similar informal manner, so we have assumed the facts to be as represented by the Government.

tional, or instead only testimonial, immunity. *Cf. United States v. Andreas*, 14 M.J. 483 (C.M.A.1983); *United States v. Newman*, 14 M.J. 474 (C.M.A.1983). Insofar as Federal prosecution was concerned, she may have already been protected by the double-jeopardy effects of her child-abuse conviction in the Federal District Court. *Cf. Illinois v. Vitale*, 447 U.S. 410, 100 S.Ct. 2260, 65 L.Ed.2d 228 (1980); *Brown v. Ohio*, 432 U.S 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977); Thomas, *The Prohibition of Successive Prosecutions for the Same Offense: In Search of a Definition*, 71 Iowa L.Rev. 323 (1986).

If Fort Ord was under exclusive Federal jurisdiction, then Claudia would never have been subject to state prosecution. If, however, California has retained concurrent jurisdiction over this installation, then she may well have been subject to state prosecution from which her conviction in the Federal district court would give no protection.[4] In that event, military authorities could not provide her with transactional immunity. *Cf. United States v. Andreas, supra.*

"The basic litmus of Sixth Amendment unavailability is established: '[A] witness is not "unavailable" for purposes of the ... exception to the confrontation requirement unless the prosecutorial authorities have made a *good-faith effort* to obtain his presence at trial.' "[5] We do not believe that this requirement of "a good-faith effort" signifies that military authorities would have to attempt to obtain for Claudia transactional immunity from state prosecution, if she was subject to such prosecution. In our view, the right of confrontation does not empower a defendant to insist that transactional immunity be offered an absent declarant before his extrajudicial statements can be introduced in evidence.

The issue is more difficult if Claudia requested only testimonial immunity, which imposes much less of a burden on the prosecution than does transactional immunity. *Cf. United States v. Gardner*, 22 M.J. 28 (C.M.A.1986); *United States v. Andreas* and *United States v. Newman*, both *supra*. As to the former, it is easier to contend that an offer of immunity is included within the term "other reasonable means" for purposes of Mil.R.Evid. 804(a)(5) and within "a good-faith effort" for purposes of the sixth-amendment right of confrontation.

Of course, the Government, rather than the defense, must establish the unavailability of a declarant whose extrajudicial statement is being offered in evidence against an accused. However, after the Government demonstrated Claudia's unavailability by evidence that she had disregarded a subpoena and had returned to her home in Germany without letting trial counsel know her whereabouts, the burden rested on the defense to refute this showing of unavailability. Absent more detailed information from the defense as to the conditions on which Claudia would appear as a witness, we believe that the Government's demonstration of her unavailability remained unrefuted.

B

In any event, our primary concern is not with Claudia's unavailability but with the reliability of her extrajudicial statements. In this connection, it is significant that the statement received in evidence had been made to criminal investigators.

This record contains evidence about the interrogation techniques of these investigators. For example, in the cross-examination of CID Special Agent Corbett, this colloquy appears:

---

4. Even though the Federal conviction was predicated on a California statute as incorporated by the Assimilative Crimes Act, 18 U.S.C. § 13, we doubt that it gave rise to double-jeopardy protection against state prosecution.

5. *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 2543, 65 L.Ed.2d 597 (1980), citing *Mancu-*

*si v. Stubbs*, 408 U.S. 204, 92 S.Ct. 2308, 33 L.Ed.2d 293 (1972); *California v. Green*, 399 U.S. 149, 161–62, 165, 167 n. 16, 90 S.Ct. 1930, 1936–37, 1938, 1939 n. 16, 26 L.Ed.2d 489 (1970); *Berger v. California*, 393 U.S. 314, 89 S.Ct. 540, 21 L.Ed.2d 508 (1969).

Q. *In other words, so rather than elicit from them an account of what happened, you bounce off of them various versions that you believe may be the case.*

A. That's not necessarily true, but that's one technique used if you have an uncooperative witness or——

Q. *Well did you use that technique with Angel Cordero?*

A. *Yes I did.*

(Emphasis added.)

Subsequent cross-examination of Corbett elicited this testimony:

Q. Now this statement here, it's your testimony then that this is what Angel Cordero told you?

A. In that statement?

DC: Yes.

WIT: I'm sure that's what he told me because I saw him reading the statement, and as I said before, I typed it as he was saying it. Those words, you know, may not be the exact word for word that he said, but if——

DC: Well, that's what I was ready to ask you.

WIT: If I used the exact word for word that he said it wouldn't be, you know, as easily understandable as it is.

Q. Well that's what I'm saying, is a lot of this—this is paraphrased from him, isn't it?

A. That's true.

Q. In fact Angel Cordero——

A. That's why I also said each time I'd read it back to him as we were going through the statement, "I'd say, isn't it true you just said this? 'yes.' Okay, continue from there."

Q. *Well, they're your words and not his though, is that correct?*

A. That's true.

(Emphasis added.)

Although this cross-examination of Corbett concerned his interrogation of appellant, it is entirely likely that the same widely-used technique of interrogation was employed in questioning Claudia. We do not criticize an investigator for proceeding in this manner, for otherwise he may obtain no statement at all. However, at the same time, we recognize that the statement obtained is in some respects the product of the investigator, rather than of the purported declarant. If later the declarant testifies as a witness, subject to cross-examination, the factfinder has some basis for determining to what extent the statement contains the interrogator's input; but if the declarant never testifies, this determination is much more difficult—even when, as here, the interrogator does testify.

Claudia Cordero was present on May 22 when Angel died; and her testimony about that death would be of great importance. The CID agents who interrogated her were absent when the child drowned; and they could only infer or speculate what caused the death. However, the risk exists that through Claudia's statement the agents' inferences and theories concerning the cause of death were being presented to the court-martial members as if they were the observations of an eye-witness. Appellant had no opportunity to explore through cross-examination of Claudia the extent to which the statement contained her own observations and recollections.

Claudia Cordero had a substantial motive to place the blame for Angel's death on appellant—especially because her own prior history of child abuse made her the prime suspect. Indeed, in July 1982 she had pleaded guilty in a Federal district court to abusing Angel, Jr., on the very day of his death. To allow her extrajudicial statement to CID agents to be considered as evidence without any defense opportunity to cross-examine her simply does not conform to the requirements of the sixth amendment. Moreover, because Mil.R. Evid. 804(b)(5) was undoubtedly drafted with a view to conforming with the sixth amendment, it is doubtful that Claudia's statement falls within the purview of this Rule.

We note that Mil.R.Evid. 803(8)(A), which generally allows the reception in evidence of public records and reports, specifically

excludes matters which there was a duty to report but which were "observed by police officers and other personnel acting in a law enforcement capacity." Perhaps this exception reflects an assumption on the part of the Rule's drafters that police officers may have a unique outlook. Often they are not merely observing and evaluating but are seeking to build a case to prove guilt. Indeed, for this reason, we have held that probable cause for authorizing a search should not be determined by someone engaged in investigating and "ferreting out crime." *United States v. Rivera*, 10 M.J. 55, 61 (C.M.A.1980); *see United States v. Murray*, 12 M.J. 139, 140–41 (C.M.A.1981); *cf. Lo-Ji Sales, Inc. v. New York*, 442 U.S. 319, 99 S.Ct. 2319, 60 L.Ed.2d 920 (1979). Just as the drafters of Mil.R.Evid. 803(8) declined to deprive an accused of his right to cross-examine a police officer who had prepared a public record or report, we are unwilling to allow the use against Cordero of this extrajudicial statement in the preparation of which criminal investigators played a major role, when he has no opportunity to cross-examine the declarant.

Investigators should be encouraged to take detailed statements from witnesses. These statements may be valuable during the investigation and later at trial to corroborate, impeach, or refresh recollection. However, in a case like this, a statement to an investigator cannot be used as a substitute for a live witness—even if the witness is unavailable.

### III

■ Because appellant's right of confrontation was violated, we must reverse his conviction, unless we conclude that the evidence was harmless beyond a reasonable doubt. *United States v. Remai*, 19 M.J. 229 (C.M.A.1985). The Court of Military Review reached that conclusion; and we agree with them.

If the court members had accepted Claudia's statement as correct in any material part, they would have returned a verdict of unpremeditated murder or of involuntary manslaughter committed in the course of an assault. The court-martial's finding that Cordero had committed manslaughter by culpable negligence implies a rejection of her account of Angel's death. However, the court members undoubtedly concluded that appellant's own version of events—as embodied in his sworn testimony—established the commission of involuntary manslaughter by his culpable negligence. Leaving his abused and crying son in scalding water while he spent thirty minutes in unsuccessful efforts to phone his sister in New York and his brother in Hawaii in order to seek their advice and comfort was culpably negligent conduct. Even if, while he attempted to make these calls, Claudia reentered the bathroom and further abused the child, appellant's failure to protect his son after discovering him in the tub in an abused condition was culpable negligence that contributed to Angel's death.

We do not recall any specific claim by appellant that, if Claudia's statement had been excluded, he would never have taken the stand and so would not have incriminated himself. However, such a claim, if made, would have no merit. Clearly, the reason Cordero testified in his own behalf was to avoid the damage that otherwise might have resulted from his own extrajudicial statements that had been properly admitted in evidence by the military judge.

Cordero took the stand in a trial where he had the assistance of able counsel. His testimony, which apparently was believed in large part by the court members, sufficed to exonerate him from the charge of murder; but it provided persuasive grounds for the findings by the court members that Angel's death was due to his father's culpable negligence. We perceive no reason to set aside that finding.

### IV

The decision of the United States Army Court of Military Review is affirmed.

Judge SULLIVAN did not participate.

COX, Judge (concurring in part and concurring in the result):

■■ I agree with Chief Judge Everett and the Court of Military Review that the error in receiving evidence of Mrs. Cordero's statement, under the circumstances of this case, was harmless beyond a reasonable doubt. Further, although it is unnecessary for us to decide, I would agree that Mrs. Cordero was "unavailable" under the confrontation clause and the Military Rules of Evidence. For this reason, I would prefer to await an appropriate case to explore the ramifications of Mil.R.Evid. 803(24). In addition, the United States Supreme Court will shortly be construing an analogous case (*New Mexico v. Earnest*, No. 85–162, argued April 1, 1986, 54 L.W. 3157), so I will withhold deciding whether the military judge here merely abused his discretion in admitting this utterly unreliable statement or whether statements of this sort are so inherently suspect as to be inadmissible as a class.* In either case, I agree that this particular evidence should never have been placed before the factfinders.

* I note that both Mil.R.Evid. 803(24) and 804(b)(5) contain the explicit predicate to admission that "(B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts." In view of appellant's own rather extensive admissions, as outlined by the Chief Judge, and the inherent unreliability of Mrs. Cordero's statement, *cf. Olson v. Green*, 668 F.2d 421, 427–28 (8th Cir.), *cert. denied*, 456 U.S. 1009, 102 S.Ct. 2303, 73 L.Ed.2d 1305 (1982); *United States v. Sarmiento-Perez*, 633 F.2d 1092, 1102–03 (5th Cir. 1981), it appears that this prerequisite also was unsatisfied.